943 F.2d 53
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James C. BICKETT, Joseph Keith Bickett, and Marion Paul
Elder, Defendants-Appellants.
 Nos. 90-5710, 90-5711, 90-5712, 90-5726, 90-5760 and 90-5783.
 United States Court of Appeals, Sixth Circuit.
 Sept. 10, 1991.
 
 Before RALPH B. GUY, Jr. and ALAN E. NORRIS, Circuit Judges and FRIEDMAN, District Judge.*
 PER CURIAM.
 
 
 1
 This is a consolidated appeal of the criminal convictions of James Bickett, Joseph Bickett, and Marion Paul Elder, for conspiracy to distribute and possession with intent to distribute over 100 kilograms of marijuana. All three defendants challenge the refusal of the district court to grant a new trial based upon newly discovered evidence, the failure of the prosecutor to disclose exculpatory evidence, and prosecutorial misconduct. James Bickett also challenges the sufficiency of the evidence to convict all defendants in a single conspiracy. Additionally, James and Joseph Bickett challenge their sentences, including enhancements for possession of a firearm during a drug trafficking offense. Finally, Joseph Bickett and Marion Paul Elder challenge the evidentiary rulings of the court during their cross-examination. We affirm the judgments and sentences of all three defendants.
 
 I.
 
 2
 In 1984, Elder, a Kentucky resident, traveled to Maine where he met John Hunt. When Hunt learned that Elder had access to large quantities of marijuana, he arranged a trip to Kentucky to buy marijuana from Elder. Hunt then drove to Kentucky, purchased marijuana from Elder, and transported it back to Maine, where he resold it. After several months of regular trips, Hunt learned that James and Joseph Bickett supplied Elder with marijuana, and Hunt began to buy marijuana directly from the Bicketts. On these trips, Hunt was accompanied by different traveling companions who assisted him with the driving, including Roland Villacci.
 
 
 3
 On November 4, 1988, Kentucky police went to James Bickett's house because they had been informed that James Bickett had a wild lion cub that came from a fugitive convicted drug dealer, Bobby Joe Shewmaker. Bickett drove off in his car when the police attempted to question him. When the police pulled him over, they found a loaded handgun under the armrest of the car and subsequently arrested him for being a felon in possession of a firearm.
 
 
 4
 Meanwhile, Hunt traveled to Louisiana to obtain better quality marijuana than the Bicketts could supply. While there, however, he was stopped for speeding, arrested and convicted for possessing marijuana, and sentenced to jail. Joseph Bickett suggested that Hunt choose a replacement to carry on Hunt's marijuana business while Hunt was incarcerated. Michael Haskell became Hunt's replacement and, from then on, the Bicketts supplied marijuana to Haskell.
 
 
 5
 When Hunt was released from prison, he joined Haskell in the marijuana business. Shortly thereafter, both were arrested by federal authorities in Maine. Hunt told the authorities in Maine about Elder and the Bicketts. After the federal authorities in Maine contacted the federal authorities in Kentucky, Hunt and Haskell agreed to make one more purchase of marijuana from the Bicketts under police surveillance.
 
 
 6
 On February 12, 1989, Hunt and Haskell negotiated the purchase of 150 pounds of marijuana with Joseph Bickett at Bickett's house. Joseph Bickett agreed to contact them at their motel after he had obtained the marijuana. During the negotiations, a .22 caliber rifle and a loaded twelve gauge shotgun were leaning against the wall near the door.
 
 
 7
 On the following day, Hunt and Haskell received a phone call to inform them that the 150 pounds of marijuana was located at Joe Lamkin's garage. Hunt and Haskell drove to Lamkin's garage, where Lamkin, Hunt and Haskell loaded 150 pounds of marijuana into the car driven by Hunt and Haskell. After the car was loaded, James Bickett arrived at the garage and calculated what was owed. All who were present then traveled back to Hunt's motel to obtain the money for payment. When James Bickett and Lamkin arrived at the motel, the police arrested them.
 
 
 8
 Next, the police went to Joseph Bickett's house to arrest him. Bickett's sister gave the police access to the house. While in the kitchen to arrest Joseph Bickett, police observed and seized a twelve gauge shotgun, a .22 caliber rifle, and a set of digital scales with cocaine residue on them. The police also noticed and seized a makeshift bowl constructed of aluminum foil wrapped in duct tape containing cocaine residue. Finally, the police conducted a protective sweep of Joseph Bickett's house to ensure that there was no one else present who could harm the police or the evidence.
 
 
 9
 In the district court, the jury returned guilty verdicts against James Bickett, Joseph Bickett, and Marion Elder, who were charged by a federal grand jury in a twelve-count superseding indictment. James and Joseph Bickett were convicted of conspiracy to distribute and possession with intent to distribute over 100 kilograms of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1), aiding and abetting each other to possess with intent to distribute approximately 150 pounds of marijuana in violation of 18 U.S.C. § 2, being felons in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and simple possession of cocaine in violation of 21 U.S.C. § 844. The district court sentenced James Bickett to a total of 235 months imprisonment, and Joseph Bickett to a total of 240 months imprisonment. Elder was convicted of conspiracy to distribute and possession with intent to distribute over 100 kilograms of marijuana in violation of 21 U.S.C. § 846. The district court sentenced Elder to 97 months imprisonment.
 
 
 10
 On February 8, 1990, after the first day of Hunt's testimony, the United States Marshals moved Hunt and Villacci from the Jefferson County Jail to the Bullitt County Jail where Haskell was confined. Hunt, Haskell, and Villacci all were placed in a dormitory area with individual cells. After sentencing, all three defendants moved for a new trial based upon "newly discovered evidence" that three of the United States' chief witnesses, Hunt, Haskell, and Villacci, allegedly committed perjury and violated the rule of sequestration when the United States placed them in the same jail cell during trial, enabling them to tailor their testimony. The district court denied the motions. Each defendant has appealed his sentence and the denial of his motion for a new trial.
 
 II.
 
 11
 Appellants raise the following issues, which we consider in turn:
 
 
 12
 (1) whether the district court abused its discretion in denying defendants' motions for a new trial based upon: (a) newly discovered evidence that a court order to sequester witnesses was violated in contravention of Fed.R.Evid. 615; (b) allegations that the United States failed to disclose exculpatory evidence; and (c) allegations that the United states engaged in prosecutorial misconduct by providing Haskell's prior sworn statement to him during his direct examination;
 
 
 13
 (2) whether the district court erred in refusing to dismiss the charge that James Bickett was a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), inasmuch as the governor of Kentucky had restored Bickett's civil rights without expressly limiting his right to possess a firearm;
 
 
 14
 (3) whether the district court erred in refusing to sever the charge that James Bickett was a felon in possession of a firearm from the charges of conspiracy to distribute and possession with intent to distribute controlled substances;
 
 
 15
 (4) whether the district court abused its discretion in its evidentiary rulings in: (a) allowing the United States to use Elder's prior grand jury testimony for impeachment purposes; (b) allowing the United States to ask Elder's character witnesses under cross-examination whether their opinions of Elder's truthfulness would change if they knew Elder lied under oath to a federal grand jury and lied to police during an official investigation; (c) allowing in evidence of items observed during a protective sweep of Joseph Bickett's residence, and (d) allowing the introduction of illegally obtained evidence to impeach Joseph Bickett's testimony;
 
 
 16
 (5) whether there was sufficient evidence of a single conspiracy among defendants for a rational trier of fact to find James Bickett guilty beyond a reasonable doubt; and,
 
 
 17
 (6) whether the district court's application of the sentencing guidelines were clearly erroneous in: (a) assessing a two-level increase in the Guidelines calculations with regard to James and Joseph Bickett for possession of a firearm during the drug trafficking offense; (b) calculating the weight of marijuana attributable to James Bickett; and (c) assessing a four-level enhancement of Joseph Bickett's sentence for acting as an organizer or leader.
 
 III.
 
 18
 James Bickett, Joseph Bickett, and Marion Elder all assert that the district court abused its discretion in denying their motions for a new trial. The appeal rests on three grounds. First, defendants allege that there is newly discovered evidence that a court order to sequester witnesses was violated in contravention of Fed.R.Evid. 615. Second, James Bickett alleges that the prosecution failed to provide exculpatory evidence to defense counsel. Third, Joseph Bickett alleges that the United States engaged in prosecutorial misconduct.
 
 
 19
 A. Motion for New Trial Based Upon Newly Discovered Evidence
 
 
 20
 All defendants assert that the district court abused its discretion in denying their motions for a new trial on the basis of newly discovered evidence that a court order to sequester witnesses was violated in contravention of Fed.R.Evid. 615. Defendants argue that the violation of the sequestration order meets the following standard for granting a new trial on the grounds of newly discovered evidence:
 
 
 21
 (1) the new evidence was discovered after the trial;
 
 
 22
 (2) the evidence could not have been discovered earlier with due dilignece;
 
 
 23
 (3) the evidence is material and not merely cumulative or impeaching; and
 
 
 24
 (4) the evidence would likely produce an acquittal.
 
 
 25
 United States v. O'Dell, 805 F.2d 637, 640 (6th Cir.1986) (citing United States v. Barlow, 693 F.2d 954, 966 (6th Cir.1982)).
 
 
 26
 Defendants argue that they did not learn that the sequestration order had been violated until after trial. Elder was incarcerated in Bullitt County Jail, where he discovered that Hunt, Haskell, and Villacci had discussed their testimony for many hours on February 8, 1990. Defendants claim that they were diligent in obtaining this information once it was revealed to Elder, and, furthermore, that during the trial the assistant United States attorney withheld information from defense counsel as to where the witnesses were located. Defendants argue further that because these witnesses' testimony was material to the issue of the existence of a conspiracy to traffic marijuana in this case, Haskell's differing testimony also would be material to the issue of the existence of a conspiracy among these three defendants, and not merely of an impeaching nature. As to the fourth element, defendants argue that had Haskell testified differently, a jury might not have found defendants guilty.
 
 
 27
 Defendants make an additional argument that since the newly discovered evidence indicates that Haskell committed perjury, the following less stringent standard for granting a new trial should be applied:
 
 
 28
 (1) the court must be reasonably well satisfied that the testimony given by a material witness is false;
 
 
 29
 (2) that the jury might have reached a different conclusion without such testimony; and
 
 
 30
 (3) that the party seeking a new trial was taken by surprise when the false testimony was given and the defendant was unable to correct the falsity or did not discover it until after trial.
 
 
 31
 Davis v. Jellico Community Hosp., Inc., 912 F.2d 129 (6th Cir.1990); Larrison v. United States, 24 F.2d 82 (7th Cir.1928).
 
 
 32
 The government's position is that the O'Dell standard rather than the Jellico standard is appropriate in this matter, and that defendants fail to meet the requirements outlined in that case for the grant of a new trial.
 
 
 33
 The standard of review concerning motions for a new trial is an abuse of discretion standard. See United States v. Allen, 748 F.2d 335, 337 (6th Cir.1984). As a preliminary matter, we find that the correct legal standard to be used in resolving this issue is the O'Dell test, which was applied by the trial court, and not the less restrictive Jellico test urged by defendants. Historically, the Jellico test has been applied only in perjury cases in which a material witness has later recanted testimony. See Gordon v. United States, 178 F.2d 896 (6th Cir.1949). In the instant case, third parties are claiming that a material witness perjured himself.
 
 
 34
 After careful consideration of the circumstances and application of the O'Dell test, we find that defendants failed to prove the requirements necessary for the grant of a new trial on the grounds of newly discovered evidence. First, we note that Hunt's testimony, which in large part was completed on the first day, by itself could have given the jury sufficient grounds to find a single conspiracy and to convict all three defendants.
 
 
 35
 Furthermore, the record indicates that defendants were aware at the time of trial that the governments' witnesses might have had an opportunity to discuss their testimony with each other. At trial, defendant Elder called two witnesses, Rick Subien and Tim Seng, to substantiate his allegations of the witnesses' collusion. Inasmuch as defendant Elder called two witnesses at trial to address the alleged violation of the sequestration order, it is apparent that such evidence was discoverable with due diligence. Additionally, even if the evidence had shown collusion of the witnesses for the purpose of tailoring their testimony, such evidence could only have been used to impeach their testimony, and the testimony of the five new witnesses proffered by defendants would merely have been cumulative. Finally, defendants failed to demonstrate that the testimony of five new persons would likely produce an acquittal. Nothing in the affidavits of the two witnesses employed by the Bullitt County Jail indicates that they had firsthand knowledge of the alleged collusion.
 
 
 36
 While we find that the trial court did not abuse its discretion in denying defendants' motion for a new trial based upon newly discovered evidence, the government's conduct in this matter is disquieting. Although there is no proof that the governments' witnesses tailored their testimony, the government acted improperly by placing all three witnesses in the same cell for an extended period of time after the first day of trial. Such conduct raises the specter of impropriety, and, for that reason alone, should have been avoided.
 
 
 37
 B. Motion for New Trial for Failure to Provide Exculpatory Evidence
 
 
 38
 James Bickett complains that the United States failed to inform him of Haskell's reluctance to testify at trial and that the prosecution failed to provide defense counsel with Hunt's DEA Form 6 Statement containing exculpatory material. He asserts that both are discoverable under Brady v. Maryland, 373 U.S. 83 (1963). Defendant cites United States v. Bagley, 473 U.S. 667 (1985), for the proposition that Hunt's DEA Form 6 Statement contains impeachment evidence that falls within the Brady rule. The Court in Bagley held that the proper standard of materiality to determine whether a conviction should be reversed for failure to disclose requested evidence that could have been used to impeach a government witness is "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. Defendant argues that the same standard of materiality applies to cases of prosecutorial failure to disclose evidence favorable to the accused even where there has been no request for such evidence. Accordingly, defendant asserts that the government's failure to inform defendant of Haskell's reluctance to testify at trial also falls within the Brady rule.
 
 
 39
 The United States responds that the trial court did not abuse its discretion in finding that the DEA Form 6 Report did not fall within the Brady definition of exculpatory evidence. The district court found that the report contained exclusively inculpatory evidence that defendant only could use for impeachment purposes. Furthermore, the trial court found that any impeachment value of the report was minimal, inasmuch as the issues contained in the report were fully explored at trial during cross-examination. Additionally, the government responds that it did not fail to disclose any material pertaining to Haskell's reluctance to testify for the simple reason that no prosecutorial threats were made to Haskell, and, therefore, no such evidence exists.
 
 
 40
 We find that the trial court did not abuse its discretion in denying a new trial based upon the government's failure to provide exculpatory evidence. The court acted well within its discretion in finding that the report referred to by defendant contained inculpatory rather than exculpatory evidence, and therefore, did not fall within the Brady definition. Brady requires disclosure only of evidence that is both favorable to the accused and material either to guilt or punishment. Brady, 373 U.S. at 87. Furthermore, the court exercised its discretion properly in finding that the allegations regarding Haskell's reluctance to testify were not exculpatory material. The district court properly found that the allegations were not credible inasmuch as they were contained in the affidavit of a federal prisoner taken after trial.
 
 
 41
 C. Motion for New Trial for Prosecutorial Misconduct
 
 
 42
 Joseph Bickett alleges that the United States committed prosecutorial misconduct by providing Haskell's sworn statement to him while he was still on direct examination. Defendant asserts that the standard announced in Donnelly v. DeChristoforo, 416 U.S. 637 (1974), should be applied to the instant case. In Donnelly, the court held that to reverse a conviction based upon prosecutorial misconduct, the misconduct must be sufficiently prejudicial in the context of the entire trial to violate the defendant's due process rights. Defendant claims he was prejudiced because Haskell was able to correct his previous day's testimony in support of the government's case. Defendant points to this act as yet another example of the prosecution's effort, prevalent throughout the trial, to facilitate witnesses' tailoring of their testimony.
 
 
 43
 The United States argues that a court should not reverse a conviction on grounds of prosecutorial misconduct unless the resulting prejudice permeates the entire trial. See United States v. Morrow, 923 F.2d 427, 432 (6th Cir.1991) (citing United States v. Terry, 729 F.2d 1063, 1070 (6th Cir.1984)). The government asserts that defendant has failed to show any resulting prejudice from Haskell's review of his own prior statement. The United States notes that Haskell did not receive any new information, but merely reviewed his previous statement. Moreover, since his review of the statement was addressed during cross-examination, the jury was aware of the incident and was able appropriately to weigh the evidence in their deliberations.
 
 
 44
 We uphold the district court's ruling that Haskell's review of his prior statement constituted harmless error. This circuit has held that "to warrant a new trial, ... prosecutorial misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." United States v. Frost, 914 F.2d 756, 768 (6th Cir.1990). The district court exercised its discretion properly in finding that the prosecutorial misconduct complained of here was not so pronounced or persistent that it permeated the entire trial atmosphere. Haskell was but one of three chief witnesses for the prosecution. Moreover, the jury was apprised of Haskell's review of his prior statement, and was able to weigh that factor appropriately in considering all the evidence at trial.
 
 IV.
 
 45
 James Bickett complains that the district court improperly refused to dismiss the charge that he was a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), inasmuch as the governor of Kentucky restored his civil rights within the meaning of 18 U.S.C. § 921(a)(20).[1] Under United States v. Cassidy, 899 F.2d 543, 546 (6th Cir.1990), he asserts that a felon is not subject to federal firearm disabilities if state law has restored the felon's civil rights without expressly limiting the felon's firearm privileges. The governor's order of restoration of civil rights did not expressly limit defendant's right to possess firearms, according to defendant.
 
 
 46
 The United States contends that the controlling law directs the court to "the whole of the state law in the state" where defendant was convicted in order to determine whether a conviction falls within the statutory definition. See Cassidy, 899 F.2d at 549. The government points out that Kentucky Revised Statute § 527.040 contains the following exceptions for possession of a handgun by a convicted felon:
 
 
 47
 (1) A person is guilty of possession of a handgun by a convicted felon when he possesses, manufactures, or transports a handgun when he has been convicted of a felony, as defined by the laws of the jurisdiction in which he has been convicted, in any state or federal court and has not:
 
 
 48
 (a) Been granted a full pardon by the governor or by the President of the United States; or
 
 
 49
 (b) Been granted relief by the United states secretary of the treasury pursuant to the Federal Gun Control Act of 1968, as amended....
 
 
 50
 The government argues that defendant does not fall within any of these exceptions, since he has not been granted a pardon from the governor of Kentucky or from the President of the United States, nor has he been granted relief by the United States Secretary of the Treasury.
 
 
 51
 We uphold the district court's finding that James Bickett was a felon in possession of a firearm. The court "must look to the whole of state law of the state of conviction to determine if firearm privileges have been expressly restricted." where a convicted felon's rights are restored, with or without a certificate or order documenting the event. Cassidy, 899 F.2d at 546. Although no express restriction was contained in the governor's restoration of Bickett's civil rights, Kentucky Revised Statute § 527.040 expressly prohibited Bickett from possessing a firearm.
 
 V.
 
 52
 James Bickett contests the joinder of the charge of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(a) with the charge of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. He contends further that the charges should have been severed under Fed.R.Crim.P. 14[2] because the evidence of his possession of a gun was highly prejudicial to the charges of conspiracy and drug possession. Additionally, defendant argues that the failure to sever the offenses was not harmless error because the court could not be certain that the error did not influence the jury or have only a very slight effect. See United States v. Halper, 590 F.2d 422, 423 (2d Cir.1979).
 
 
 53
 Defendant argues that the standard for determining whether two or more acts are 'connected' is whether "the proof of one crime constitutes a substantial portion of the proof of the other," as stated in United States v. Montes-Carenas, 746 F.2d 771, 776 (11th Cir.1984). He points out that at the time the police found defendant to be in possession of the weapon, they searched his car and house but found no evidence of illegal substances. The only connection of the weapon to the drug transaction, according to defendant, is that he was found in possession of the same firearm during the 1984-89 period encompassing the alleged conspiracy. He argues that the evidence necessary to establish the drug charges does not involve the same evidence as is necessary to prove the firearm violation charge.
 
 
 54
 The United States contends that the charge of possession of a firearm by a convicted felon was properly joined with the conspiracy and possession charges pursuant to the permissive joinder provision in Fed.R.Crim.P. 8(a).[3] Under United States v. Wirsig, 719 F.2d 859, 862 (6th Cir.1983), the government argues that Rule 8(a) should be liberally construed to promote the goals of trial convenience and judicial economy, to the extent that doing so is consistent with providing defendant a fair trial. As articulated in United States v. Gorecki, 813 F.2d 40, 43 (3d Cir.1987), the government argues that joinder of weapons charges and narcotics charges are proper because weapons are recognizable tools of the drug trade.
 
 
 55
 The United States argues further that to prove that the trial court abused its discretion on this issue, defendant would need to show compelling prejudice under Rule 14. According to the government, no such prejudice exists here because the government would be permitted in any case to "join" the issues in attacking defendant's credibility under Fed.R.Evid. 609.[4]
 
 
 56
 The proper standard for determining whether joinder is appropriate is whether the "joined counts are logically related, and there is a large area of overlapping proof." See Wirsig, 719 F.2d at 863. The United States introduced sufficient proof to establish a nexus between the conspiracy charge and the firearm charge. Furthermore, evidence that the defendant possessed a firearm may be used to prove intent, operation, a plan or knowledge of a conspiracy. The drug conspiracy and firearm charges were sufficiently connected temporally and logically to support the conclusion that the two crimes were part of the same transaction or plan. Therefore, they were properly joined under the standard set forth in Wirsig.
 
 VI.
 
 57
 Marion Elder claims that the district court abused its discretion in allowing the United States to use inadmissible evidence to cross-examine him and his character witnesses. Joseph Bickett claims that the district court abused its discretion in allowing the United States to introduce suppressed evidence and evidence obtained by a protective sweep of his home.
 
 
 58
 A. Use of Prior Grand Jury Testimony for Impeachment
 
 
 59
 Elder complains that the trial court improperly allowed the United States to cross-examine him concerning the invocation of his fifth amendment right to remain silent in testifying before a Maine grand jury. As a result, Elder argues, Fed.R.Evid. 403 was violated because the jury was misled to believe that Elder lied to the grand jury. Elder contends that by asking him if he knew a man named James Bickett, contrary to a prior agreement, the United States implicitly questioned him concerning his invocation of his fifth amendment rights.
 
 
 60
 The United States responds that it never elicited testimony that Elder invoked his fifth amendment right during the Maine grand jury testimony. The government asserts that it used Elder's prior grand jury testimony only for impeachment purposes on cross-examination. The prosecutor asked Elder whether, during the Maine testimony, he was asked the question of whether he knew James Bickett. Elder admitted to being asked that question and responding in the negative. Elder then testified that he did not know James Bickett.
 
 
 61
 The proper standard of review concerning evidentiary issues is that of abuse of discretion. See United States v. Rios, 842 F.2d 868, 872 (6th Cir.1988) (per curiam), cert. denied, 109 S.Ct. 840 (1989). We find that the district court did not abuse its discretion in ruling that the cross-examination of Elder was proper. The prosecutor did not question Elder concerning the invocation of his fifth amendment right, nor did he ask Elder about the specific question to which Elder responded by invoking his fifth amendment right. Rather, the prosecutor asked Elder about the question he had answered before the Maine grand jury. The Maine grand jury had asked Elder whether he knew a man named James Bickett, and whether he knew anybody with the last name of Bickett. Elder had invoked his fifth amendment right in response to the second question. However, he had answered the first question in the negative. Elder errs in joining the two questions, which are separable. Accordingly, we affirm this ruling by the trial court.
 
 B. Cross-Examination of Character Witnesses
 
 62
 Elder complains that the district court also abused its discretion in its evidentiary rulings during cross-examination of his five character witnesses and Jan Fuson, the director of a private prison. The five character witnesses were asked two questions: (1) whether they would change their opinion of Elder's character if they knew that Elder had lied to a police officer about his association with known drug dealers in an official drug investigation, and (2) whether they would change their opinion about Elder's character if they found out that Elder had lied to a federal grand jury under oath. In addition, Fuson was asked whether employees of the prison had committed certain criminal acts, and the nature of his advice to Elder at the time of Elder's arrest.
 
 
 63
 Defendant argues that the two questions asked of Elder's character witnesses were so closely tied to the conspiracy offense that in effect the questions sought speculative responses about the subject matter for which he was on trial. He argues that as such these questions violated Fed.R.Evid. 405(a).[5] Under United States v. Siers, 873 F.2d 747, 749 (4th Cir.1989), defendant contends that in cross-examining a defendant's character witness, it is improper to ask hypothetical questions in which it is assumed that the defendant is guilty of the crimes charged.
 
 
 64
 Defendant also complains that the United States did not have a good faith basis for cross-examining Fuson as to whether he knew if any employees had committed criminal acts. Furthermore, defendant argues that the United States improperly cross-examined Fuson regarding the nature of his advice to Elder at the time of his arrest. This question allegedly was designed to draw out Elder's assertion of his constitutional rights to silence and counsel for the purpose of imputing that Elder was guilty. Under Doyle v. Ohio, 426 U.S. 610 (1976), defendant contends that the use of his silence at the time of arrest for impeachment purposes violated his rights as guaranteed by the fifth and fourteenth amendments. Defendant argues additionally that "comments that penalize a defendant for the exercise of his right to counsel and that also strike at the core of his defense cannot be considered harmless error," as stated in United States v. McDonald, 620 F.2d 559, 564 (5th Cir.1980). According to defendant, there should be no difference whether the United States elicits such information from a key witness or directly from the defendant.
 
 
 65
 The United States asserts that the district court properly allowed the cross-examination of Elder's five character witnesses. Citing to the case of United States v. Frost, 914 F.2d 756, 772 (6th Cir.1990), the government argues that under Fed.R.Evid. 405(a), it is permitted to ask defendants' character witnesses whether they have heard of specific instances of conduct and whether such knowledge would change their opinion of the defendant's reputation. The United States contends further that it questioned Fuson about the nature of his advice to Elder at the time of Elder's arrest for the purpose of impeaching Fuson's testimony and showing bias. The government asserts that the district court made a specific ruling that Elder's counsel opened the door for this line of questioning by exploring the prison's programs for overseeing its employees. The lower court also ruled that no constitutional privilege was involved because the question regarding Fuson's advice to Elder did not address what Elder said, but rather the nature of Fuson's advice to Elder. Accordingly, the United States argues, the district court acted well within its discretion in its evidentiary rulings.
 
 
 66
 We agree with the government's characterization of this issue, and find that the district court did not abuse its discretion in making its evidentiary rulings regarding Elder's five character witnesses and Fuson. As we stated in Frost, "[a]llowing the government to ask defendants' reputation character witnesses if they had heard of specific acts of conduct was not an abuse of discretion of the district court, and, indeed, was a textbook application of Fed.R.Evid. 405(a)." Frost, 914 F.2d at 722.
 
 
 67
 The two questions defendant characterizes as inseparable indeed are separable, and do not rest upon an assumption of Elder's guilt. During a 1987 interrogation of Elder by a police officer, Elder denied knowing Hunt. At trial, Elder and his wife, among others, testified that Elder not only knew Hunt, but that Hunt had visited Elder's house. Therefore, either the police officer lied or Elder lied. Neither conclusion, however, rests upon an assumption that Elder is guilty of conspiracy. Similarly, the trial judge appropriately declared that he would allow the jury to decide whether Elder's response to the Maine grand jury was a lie because Elder had given conflicting testimony.
 
 
 68
 As to Fuson's cross-examination, while we question the propriety of the prosecutor's comment to Fuson, we do not find that that the circumstances below squarely raise the question dealt with in McDonald, as defendant argues. The testimony elicited did not involve Elder's own invocation of his constitutional rights under the fifth and sixth amendments, and, as such, is distinguishable from McDonald. The prosecutor's comments thus did not strike at the core of Elder's defense, nor did they deprive him of a fundamentally fair trial. It should also be noted that the trial court offered a curative instruction on this issue, which defense counsel declined.
 
 
 69
 C. Evidence of Items Observed During a Protective Sweep
 
 
 70
 Joseph Bickett complains that the trial court violated his fourth amendment privileges against illegal search and seizure by allowing into evidence items observed during an alleged protective sweep of his home at the time of his arrest. The rule concerning protective sweeps, as articulated in Maryland v. Buie, 110 S.Ct. 1093, 1094 (1990), is that the fourth amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene. Since the arresting officers in this matter were met with no resistance or violence, defendant argues, they had no reasonable belief that there was an individual in the house who posed a danger to the police.
 
 
 71
 The United States argues that the requirements for a protective sweep under Buie were met in this instance, inasmuch as specific and articulable facts supported the arresting officers' belief that there might be someone else in the house threatening their safety. The government points out that while the officers were arresting defendant in the kitchen, they found both loaded guns and drugs. In addition, the government notes that there were many more cars parked at the house than people in the kitchen. Furthermore, defendant agreed to allow the protective sweep and only asked that the officers not look in the drawers.
 
 
 72
 We find that the district court acted well within its discretion in ruling that the items obtained during the protective sweep were allowable into evidence. The arresting officers gave specific facts in support of their reasonable belief that there may have been some other individual(s) in the house who threatened their safety at the time of the arrest.
 
 
 73
 D. Introduction of Illegally Obtained Evidence to Impeach
 
 
 74
 Joseph Bickett claims that the district court improperly allowed four pieces of suppressed evidence to be introduced for the purpose of impeaching him on cross-examination. The items of suppressed evidence were: A pipe for free-basing cocaine; a green leafy substance on the bathroom shelf; a package of white powder floating in the commode; and a loaded firearm in defendant's car. Under United States v. Havens, 446 U.S. 620, 627 (1980), defendant contends that illegally obtained items only may be introduced into evidence to impeach defendant's "answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination." Defendant argues that the United States failed to impeach him by eliciting conflicting answers to prior testimony.
 
 
 75
 The United States contends that none of the four items was introduced into evidence. The prosecution merely asked defendant questions concerning whether or not he possessed the items at the time of arrest.
 
 
 76
 We find that the district court used its discretion properly in allowing the government to cross-examine Joseph Bickett concerning his possession of the suppressed items. The Supreme Court has indicated that the prosecution must restrict the introduction of suppressed evidence to impeachment purposes, that is, it is permissible only to ensure that a defendant is not perjuring himself while testifying. Havens, 446 U.S. at 627. The prosecutor in this matter only asked questions concerning whether defendant possessed these items at the time of his arrest. Since defendant answered in the affirmative, the prosecution did not move to introduce the items into evidence.
 
 VII.
 
 77
 James Bickett alleges that there was insufficient evidence to sustain the conviction for a single conspiracy among defendants. He claims that two conspiracies existed: one involving Elder and Hunt, and another involving Hunt and the Bicketts. Furthermore, he asserts that joinder of these separate conspiracies entitled defendants to a directed verdict, since each defendant had been prejudiced by the "spillover" effect of evidence introduced against other defendants.
 
 
 78
 In support of his argument, defendant contends that his due process rights were violated because the indictment, charging a single conspiracy, varied from the proofs, indicating two conspiracies. The variance allegedly prejudiced defendant's right "not to be tried en masse for the conglomeration of distinct and separate offenses committed by others," as stated in Kotteakos v. United States, 328 U.S. 750, 775 (1946). In United States v. Camiel, 689 F.2d 31 (3d Cir.1982), the Third Circuit held that Kotteakos implicitly established a two-pronged test in a conspiracy case for purposes of reversal. First, there must be a variance between the indictment and the proof. Second, the variance must prejudice some substantial right of the defendant.
 
 
 79
 As to the first prong, defendant argues that only the testimony of Hunt and Villacci linked Elder and the Bicketts together in a single conspiracy. This joinder of conspiracies allegedly prejudiced defendant's case because the evidence used to prove a conspiracy between Elder and Hunt was also introduced as evidence in his case to prove the conspiracy between the Bicketts and Hunt. By introducing evidence of a distinct and separate offense of others, defendant's due process rights allegedly were violated.
 
 
 80
 The United States agrees that the two-pronged test articulated in Camiel and adopted by this Circuit in United States v. Kelley, 849 F.2d 999 (6th Cir.1988), is applicable to this issue. However, the United States contends that defendant fails to support either prong. As to the first prong, the United States argues that there is no variance between the indictment and the proof because Hunt, defendant's accomplice, testified to buying marijuana directly from the Bicketts after learning that his supplier, Elder, was obtaining his marijuana from the Bicketts. According to the government, this testimony was sufficient to establish the connection among defendants necessary to prove the existence of a single conspiracy. The government points out, under United States v. Gallo, 763 F.2d 1504, 1518 (6th Cir.1985) (citing Holland v. United States, 348 U.S. 121, 140 (1954)), that circumstantial evidence such as this is entitled to the same weight as direct evidence when determining sufficiency. Furthermore, "the uncorroborated testimony of an accomplice may support a conviction under federal law." Gallo, 763 F.2d at 1518. Additionally, the United States asserts that whether a single conspiracy or multiple conspiracies have been shown is a question of fact to be resolved by the jury. Finally, the United States argues that even if defendant were able to establish the first prong, defendant has failed to show the compelling prejudice necessary to warrant severance from Elder in the alleged dual conspiracy under Fed.R.Crim.P. 14.
 
 
 81
 The standard for reviewing claims of insufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Applying this standard, we find that the district court properly determined that there was sufficient evidence of a single conspiracy among defendants. Hunt, Villacci, and Haskell testified as to the connection between Elder and the Bicketts. The testimony of any one of these witnesses linking defendants together would have been a sufficient basis for a finding of a single conspiracy. Furthermore, this testimony was substantiated by circumstantial evidence that Elder lied to police officers by denying that he knew James Bickett. Viewing this evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that a single conspiracy existed.
 
 VIII.
 
 82
 A. Possession of a Firearm During Drug Trafficking
 
 
 83
 James and Joseph Bickett maintain that the district court erred in assessing a two level increase in their guideline calculations for possessing a firearm during the drug trafficking offense. James Bickett concedes that under United States v. Moreno, 899 F.2d 465, 470 (6th Cir.1990), "[i]t is defendants' burden to show that is was clearly improbable that their possession of firearms was related in any way to the conspiracy." He nevertheless asserts that there is no proof that he possessed a firearm during the commission of any act in furtherance of the alleged conspiracy. Defendant points out that at the time he was found in possession of a firearm, the police were looking for a lion cub. Furthermore, when the police searched his car and house after finding the gun, they found no drugs. Additionally, no witnesses ever testified at trial that defendant had a gun during any of the alleged drug transactions. Defendant also contends that the gun was unrelated to the conspiracy because he never used the gun to facilitate the commission of any drug trafficking offense.
 
 
 84
 Joseph Bickett claims that it was inappropriate for the district court to consider the firearms found at the time of his arrest because the jury acquitted him of the charge of using and carrying a firearm in relation to a drug trafficking crime. In addition, defendant contends that there is no evidence that a handgun found in his car was present during the commission of any drug trafficking offense.
 
 
 85
 The United States notes that U.S.S.G. § 2D1.1(b)(1) provides that "[i]f a dangerous weapon (including a firearm) was possessed during the commission of the offense, increase by 2 levels." The government states that according to the guidelines, possession of a firearm during the commission of the offense establishes a presumption that the possession is connected with the offense. The United States argues that James Bickett has not overcome this presumption. His refusal to answer the door and his immediate flight allegedly show that it was not clearly improbable that the firearm was connected to the conspiracy.
 
 
 86
 The United States also maintains that Joseph Bickett failed to overcome the presumption that the firearms found at the time of his arrest were connected to the conspiracy. The United States notes that the district court relied upon evidence that Joseph Bickett had two guns in his kitchen while he was free-basing cocaine and conducting drug negotiations with Hunt. Furthermore, one of the guns was loaded with 00 buck ammunition used for self-defense. According to the United States, the weight of this evidence proved that it was clearly probable that the firearms were used during the commission of the conspiracy.
 
 
 87
 We find that the district court's determination that James and Joseph Bickett were in possession of firearms during the drug conspiracy is supported by the record and is not clearly erroneous. James Bickett possessed a firearm when fleeing police during the time period of the conspiracy. James Bickett possessed firearms during the drug arrest at his home. The district court properly applied a two level increase to each of their sentence calculations.
 
 B. Calculating the Weight of Marijuana
 
 88
 James Bickett complains that the district court erred in calculating the weight of marijuana attributable to him by finding that a single conspiracy existed. Defendant contends that the proper period during which marijuana is attributable to him is from March 1987 until February 1989. The 165.59 kilograms of marijuana attributable to him during this time period results in a base offense level 26. Defendant states that after adding a four level enhancement for decisionmaking authority, his base offense level is 30 and the proper sentencing range is 121-151 months.
 
 
 89
 Defendant argues further that if this court finds that a single conspiracy existed, then the appropriate time period for calculating marijuana attributable to him begins at the time a connection is shown between him and Elder. According to defendant, this time period would be from January 1985 until February 1989; with 363.77 kilograms attributable to him, the resulting sentence range would be 121-151 months.
 
 
 90
 The United States argues, citing United States v. Rodriguez, 896 F.2d 1031, 1034 (6th Cir.1990), that the district court's factual finding as to the quantity of marijuana should not be disturbed unless it was clearly erroneous. The government insists that the district court's finding was proper, and likewise that its sentence was proper in light of the quantity of marijuana and defendant's criminal history category.[6]
 
 
 91
 We agree that the "clearly erroneous" standard of review is applicable to this issue. Using that standard, we affirm the district court's calculation of the quantity of marijuana attributable to James Bickett. The district court's finding that there was a single conspiracy was not clearly erroneous. Accordingly, the amount of marijuana which may be attributed to James Bickett is properly the amount involved in the overall conspiracy.
 
 C. Acting as an Organizer or Leader
 
 92
 Joseph Bickett contends that the district court erred in assessing a four level enhancement of his sentence for acting as an organizer or leader. Under United States v. Harwell, 737 F.2d 971 (11th Cir.1984), defendant asserts that an individual cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual joined or after he has withdrawn from the conspiracy. He asserts further that there were two conspiracies, not one, and that his participation was limited to the marijuana transactions occurring from March 1987 to February 1989.
 
 
 93
 The United States asserts that the standard for reviewing the district court's determination regarding defendant's role in the offense is a clearly erroneous standard, as stated in United States v. Silverman, 889 F.2d 1531, 1540 (6th Cir.1989). U.S.S.G. § 3B1.1(a) provides for a four level enhancement if a defendant acts as an organizer or leader of a criminal activity involving five or more persons. The government argues that more than five people were involved in these offenses. Defendant directed the actions of others, including the coordination of Haskell's Maine drug operation during Hunt's incarceration.
 
 
 94
 Applying the clearly erroneous standard of review, we affirm the district court's enhancement of Joseph Bickett's sentence for acting as an organizer and leader. The district court was not clearly erroneous in finding Bickett to be an organizer who furthered the conspiracy by coordinating the replacement of Hunt by Haskell while Hunt was incarcerated in Louisiana. Moreover, defendant is not being held liable for substantive offenses committed by members of the conspiracy before he joined the conspiracy, inasmuch as the record indicates that Elder had obtained marijuana from the Bicketts from the outset of this conspiracy. AFFIRMED.
 
 
 
 *
 Honorable Bernard A. Friedman, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Section 921(a)(20) states, in relevant part: "[a]ny conviction ... for which a person ... has had civil rights restored shall not be considered a conviction for purposes of this chapter unless such ... restoration of civil rights expressly provides that a person may not ... possess ... firearms."
 
 
 [2]
 Fed.R.Crim P. 14 provides, in pertinent part: "if it appears that a defendant ... is prejudiced by a joinder of offenses ... in an indictment ..., the court may order ... a separate trial of counts...."
 
 
 [3]
 Fed.R.Crim P. 8(a) provides, in pertinent part: "[t]wo or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged ... are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."
 
 
 [4]
 Additionally, even if misjoinder occurred, the government argues that it constituted harmless error. Misjoinder can constitute harmless error only "where the unrelated charge and the evidence supporting that charge is such an inconsequential part of the joint indictment that no possible harm from misjoinder could reasonably have occurred." United States v. Bibby, 752 F.2d 1116, 1122 (6th Cir.1985). The government asserts that the firearm charge was an inconsequential part of the joint indictment and no harm from the alleged misjoinder could reasonably have occurred
 
 
 [5]
 Fed.R.Evid. 405(a) establishes the permissible methods of introducing character evidence and the general scope of cross-examination. It provides:
 (a) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
 
 
 [6]
 The district court found that defendant's crime resulted in a base offense level 28, since the overall conspiracy involved 414.2 kilograms of marijuana. U.S.S.G. § 2D1.1(a)(3) Drug Quantity Table (8) (400-700KG of marijuana). After adjustments the district court found defendant's offense level to be 34. The trial court sentenced defendant within the guideline range of 188-235 months by imposing a 235 month term of imprisonment based upon a total offense level of 34 and a criminal history category III